**Eddy J. MARIA, Petitioner,**

v.

**Edward McELROY, District Director, New York District, U.S. Immigration Service, Respondent.**

**No. 98 CV 6596(JBW).**

United States District Court, E.D. New York.

Oct. 7, 1999.

208

Ressler, New York City, by Jose Alexis Rojas, for petitioner.

Zachary W. Carter, United States Attorney, Brooklyn, N.Y., by Scott Dunn, Mary Elizabeth Delli–Pizzi, Patrick Shen, for respondent.

Nancy Morawetz, New York City, Hughes Hubbard & Reed LLP., New York City, by Renee C. Redman, Ressler &

**AMENDED MEMORANDUM AND ORDER**

WEINSTEIN, Senior District Judge.

TABLE OF CONTENTS

I. INTRODUCTION................................................ 209

II. FACTS ....................................................... 209
 A. Treatment of "Aggravated Felons" Under the Immigration Laws ..... 209
 1. "Aggravated Felony" Definition ................................ 209
 2. Immigration Consequences of Conviction of an "Aggravated Felony" ........................................................ 211
 B. Discretionary Relief from Deportation ........................... 212
 1. Section 212(c) Relief ....................................... 212
 2. Section 212(h) Relief ....................................... 212
 C. Eddy Maria's Situation ........................................ 213

III. LAW ....................................................... 215
 A. Jurisdiction to Issue a Writ of Habeas Corpus ................... 215
 B. Exhaustion of Administrative Remedies ......................... 216
 C. IIRIRA's "Aggravated Felony" Amendments Render Mr. Maria Deportable .................................................. 219
 1. Statutory Design .......................................... 219
 a. Temporal Reach of "Aggravated Felony" Definitions from th e ADAA to IIRIRA ....................................... 219
 b. Temporal Reach of IIRIRA Section 321 ..................... 220
 2. The Constitution Does Not Prevent Application of Section 321 to Render Mr. Maria Deportable................................ 222
 a. Due Process Clause ...................................... 222
 b. Ex Post Facto Clause .................................... 224
 D. AEDPA's Restrictions on Section 212(c) Relief Do Not Apply to Acts Before Enactment .......................................... 225
 1. Statutory Language Does Not Support Retroactivity ............. 226
 2. Ambiguity Does Not Support Retroactivity ..................... 228
 3. Rule of Lenity ............................................ 230
 4. Avoidance of Constitutional Issues Supports Non-retroactivity..... 230
 a. Due Process Clause ...................................... 231
 b. Ex Post Facto Clause .................................... 231
 5. International Law .......................................... 231
 a. The International Covenant of Civil and Political Rights ...... 231
 b. Customary International Law ............................. 233
 E. IIRIRA's Restrictions on Family Hardship Relief .................. 234

V. RATIONALE OF STATUTE ...................................... 235

VI. CONCLUSION ................................................. 236

## I. INTRODUCTION

In support of his petition for a writ of habeas corpus and his complaint for declaratory and injunctive relief with a stay of deportation, petitioner Eddy Maria challenges the decision of the Board of Immigration Appeals (BIA) finding him (1) deportable as an "aggravated felon" and (2) ineligible for any relief from deportation on humanitarian grounds under section 212(h) and former section 212(c) of the Immigration and Nationality Act (INA).

The decision of the BIA was based on provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, 110 Stat. 3009. Both Acts were adopted after Mr. Maria committed the offense for which the Immigration and Naturalization Service (INS) seeks to deport him. Mr. Maria challenges the applicability of AEDPA and IIRIRA to his case on both statutory and constitutional grounds. For the reasons indicated below, he is entitled only to partial relief: he is deportable, but he is eligible for a humanitarian hearing determining whether he should be permitted to remain in the United States.

## II. FACTS

### A. Treatment of "Aggravated Felons" Under the Immigration Laws

#### 1. "Aggravated Felony" Definition

The parties do not dispute that under the law in effect at the time petitioner pled guilty to attempted unarmed robbery and was sentenced to two to four years in prison, he was not deportable as an "aggravated felon" because he received a sentence of under five years. The government contends, however, that Mr. Maria was rendered deportable by the enactment of IIRIRA several months after his guilty plea. IIRIRA lowered the sentence necessary for a theft or burglary offense to be considered an "aggravated felony" from five years to one year.

"Aggravated felony" is a congressionally-created term which entered the legal lexicon via the Anti–Drug Abuse Act of 1988 (ADAA), a comprehensive drug enforcement statute which included a number of provisions concerning criminal aliens. *See* ADAA, Pub.L. No. 101–690, 102 Stat. 4181. Its evolution from a term comprising a small number of extremely serious crimes into one encompassing a broad array of offenses has taken place in a number of stages. The ADAA defined as "aggravated felonies" murder, drug trafficking, illicit trafficking in firearms or destructive devices and any attempt or conspiracy to commit such acts within the United States. *Id.* § 7342, 102 Stat. at 4469–70. It made conviction of such an offense a basis for deportation. *Id.* § 7344, 102 Stat. at 4470–71.

Since the ADAA's passage, successive immigration statutes have built on its "aggravated felony" definition, progressively expanding the term to cover a wide variety of offenses. One commentator has observed:

> The definition of aggravated felony at INA § 101(a)(43), 8 U.S.C. § 1101(a)(43), began as one paragraph in 1988. Eight years later the provision consists of twenty-one paragraphs labeled (A) through (U). In 1988 the statute identified three general crimes. Today over fifty crimes or general classes of crimes are enumerated. The amount of loss, maximum possible penalty for the crime and actual sentence imposed, regardless of any suspension or probation of that sentence, are the current mechanisms to qualify crimes as aggravated felonies.

Richard L. Prinz, *The 1996 Criminal Alien Legislation in 1997: An Overview, in Practice Under IIRAIRA: One Year Later* 205, 207 (R. Patrick Murphy ed., 1997). *See generally* Terry Coonan, *Dol-*

*phins Caught in Congressional Fishnets—Immigration Law's New Aggravated Felons,* 12 Geo.Immigr.L.J. 589, 592–605 (1998); Brent K. Newcomb, Comment, *Immigration Law and the Criminal Alien: A Comparison of Policies for Arbitrary Deportations of Legal Permanent Residents Convicted of Aggravated Felonies,* 51 Okla.L.Rev. 697, 698–701 (1998).

The Immigration Act of 1990 (IMMACT) added money laundering, crimes of violence, and additional grounds of controlled substance trafficking to the list of "aggravated felonies." *See* IMMACT, Pub.L. No. 101–649, § 501(a)(2), (3), 104 Stat. 4978, 5048. IMMACT also made the "aggravated felony" definition applicable to both federal and state convictions as well as to convictions under analogous foreign laws in certain circumstances. *See id.* § 501(a)(5), (6), 104 Stat. at 5048.

A plethora of new offenses were denominated "aggravated felonies" by the Immigration and Technical Corrections Act of 1994 (INTCA), Pub.L. No. 103–416, 108 Stat. 4320. These included theft and burglary offenses for which a sentence of at least five years was imposed, kidnapping for ransom, child pornography, RICO violations punishable by a minimum of five years, management of a prostitution business, slavery, espionage, sabotage and treason, fraud or tax evasion involving the loss of more than $200,000, alien smuggling for commercial gain, document fraud where the sentence imposed was at least five years, and failure to appear for service of sentence of a crime punishable by fifteen years or more. *See id.* § 222(a), 108 Stat. at 4320–22.

In 1996, AEDPA broadened the scope of the definition still further. It redefined previously designated "aggravated felonies," for example, by replacing the alien smuggling ground's commercial gain requirement with the imposition of a five-year sentence and by decreasing by two-thirds the number of years by which a crime must be punishable for failure to appear for service of sentence to constitute an "aggravated felony." AEDPA § 440(e)(3), 110 Stat. 1214, 1277. It also added to the "aggravated felony" roster obstruction of justice, perjury and subornation of perjury, bribery of a witness and failure to appear to answer a felony charge punishable by two or more years, AEDPA § 440(e)(8), 110 Stat. at 1278, as well as numerous less serious offenses, *see, e.g., id.* § 440(e)(1), 110 Stat. at 1277 (transmission of wagering information); *id.* § 440(e)(2), 110 Stat. at 1277–78 (transportation for purposes of prostitution); *id.* § 440(e)(4), (6), 110 Stat. at 1278 (falsely making, forging, or counterfeiting, mutilating or altering a passport where a sentence of at least eighteen months is imposed); *id.* § 440(e)(6), (7), 110 Stat. at 1278 (improper entry or re-entry or misrepresentation or concealment of facts by one previously deported for an "aggravated felony"); *id.* § 440(e)(8), 110 Stat. at 1278 (commercial bribery, counterfeiting, forgery, or trafficking in vehicles with altered identification numbers punishable by a minimum of five years).

IIRIRA followed close on the heels of AEDPA. As was the case with AEDPA, IIRIRA's contribution to the expansion of the "aggravated felony" definition was two-fold. Besides adding the crimes of rape and sexual abuse of a minor, *see* IIRIRA § 321(a)(1), 110 Stat. 3009, 3009–627, IIRIRA dramatically broadened the definition's reach by expanding the terms of many offenses already denominated "aggravated felonies." For example, whereas crimes of violence and theft and burglary offenses had previously required imposition of a sentence of at least five years in order to qualify as "aggravated felonies," IIRIRA decreased the term to one year in each of these categories. *See id.* § 321(a)(3), 110 Stat. at 3009–627. IIRIRA also lowered from five years to one year the potential term of imprisonment sufficient to make a number of offenses "aggravated felonies." *See id.* § 321(a)(4), 110 Stat. at 3009–627 (RICO and certain gambling-related offenses); *id.*

§ 321(a)(10), 110 Stat. at 3009–628 (commercial bribery, counterfeiting, forgery, or trafficking in vehicles with altered identification numbers); *id.* § 321(a)(11), 110 Stat. at 3009–628 (obstruction of justice, perjury, subornation of perjury, bribery of a witness). In addition, the statute reduced radically the amount of loss required for a money laundering, fraud, or tax evasion offense to be deemed an "aggravated felony." *See id.* § 321(a)(2), 110 Stat. at 3009–627 (money laundering an "aggravated felony" where loss exceeds $10,000, as contrasted to previous $100,000); *id.* § 321(a)(7), 110 Stat. at 3009–628 (fraud and tax evasion "aggravated felonies" where amount of loss exceeds $10,000, as opposed to previous threshold of $200,000); *see also id.* § 321(a)(9), 110 Stat. at 3009–628 (lowering sentencing threshold to twelve from eighteen months for document fraud offenses, but making exception for first time offenders whose offense was committed on behalf of a spouse, parent or child); *id.* § 321(a)(8), 110 Stat. at 3009–628 (deleting term of imprisonment requirement from alien smuggling provision, but creating exception for first offense on behalf of a spouse, parent or child).

The expansive impact of these changes has been greatly enhanced by IIRIRA's definition of "conviction" and its interpretation of "term of imprisonment" and "sentence." *See* IIRIRA § 322(a), 110 Stat. 3009, 3009–628–29 (where adjudication of guilt has been withheld, alien has nonetheless been "convicted" as long as "(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed."); *id.* ("Any reference to a term of imprisonment or a sentence ... is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence...."); *see also*

Coonan, *supra,* 12 Geo.Immigr.L.J. at 613–14 (detrimental impact on lawful permanent residents of IIRIRA's definition of conviction to encompass deferred adjudications); Michael D. Patrick, *Nullifying Expungements of Criminal Convictions,* N.Y.L.J., May 24, 1999, at 3 (discussing BIA's interpretation of IIRIRA's "conviction" definition to encompass vacated or expunged convictions); Bruce Robert Marley, Comment, *Exiling the New Felons: The Consequences of the Retroactive Application of Aggravated Felony Convictions to Lawful Permanent Residents,* 35 San Diego L.Rev. 855, 867–70 (1998) (ranks of "aggravated felons" enlarged exponentially by IIRIRA's redefinition of "conviction" and "term of imprisonment").

### 2. Immigration Consequences of Conviction of an "Aggravated Felony"

As the scope of the "aggravated felony" definition expanded, the consequences of being labeled an "aggravated felon" grew in severity due to the progressive imposition of increasingly stringent procedural limitations and restrictions on the availability of relief from deportation. The ADAA, which, as noted, first introduced the concept of an "aggravated felony" in 1988, also contained a number of provisions designed to expedite removal of those who were convicted of the crimes then encompassed by the term. *See, e.g.,* ADAA § 7347, 102 Stat. at 4471–72 (requiring that deportation proceedings involving "aggravated felons" be completed, where possible, before release from incarceration); *id.* § 7343(a), 102 Stat. at 4470 (prohibiting release of "aggravated felons" on bond following release from incarceration); *id.* § 7347(c), 102 Stat. at 4472 (presumption of deportability for "aggravated felons"); *id.* at § 7343(b), 102 Stat. at 4470 (making "aggravated felons" ineligible for voluntary departure); *id.* § 7349(a), 102 Stat. at 4473 (prohibiting "aggravated felons" from reapplying for admission for ten years after deportation).

1990's IMMACT placed further procedural restrictions on "aggravated felons." *See, e.g.,* IMMACT § 502(a), 104 Stat. at 5048 (period in which "aggravated felon" may appeal a final order of deportation reduced from sixty to thirty days); *id.* § 504(a), 104 Stat. at 5049 (requiring Attorney General to detain "aggravated felons" upon their release, whether release was to be followed by parole, supervised release or probation). *But see id.* § 504(a)(5)(B), 104 Stat. at 5049 (restoring availability of bond hearings for lawful permanent residents in deportation proceedings). Moreover, it drastically curtailed their eligibility for relief from deportation. *See, e.g., id.* § 511(a), 104 Stat. at 5052 (lawful permanent residents who served five years in prison in connection with the commission of an "aggravated felony" ineligible for 212(c) relief); id. § 515(a)(1), 104 Stat. at 5053 (aliens convicted of "aggravated felonies" barred from applying for asylum); *id.* § 509, 104 Stat. at 5051 ("aggravated felons" barred from establishing "good moral character" disqualifying them from voluntary departure, suspension of deportation and naturalization forms of relief); *id.* § 505, 104 Stat. at 5050 ("aggravated felons" ineligible for judicial recommendations against deportation and executive pardons); *id.* § 514, 104 Stat. at 5053 (increasing from ten to twenty years the period during which a deported "aggravated felon" was ineligible for readmission).

AEDPA and IIRIRA continued to attach harsher consequences to conviction of an "aggravated felony." Under AEDPA, "aggravated felonies" were among those offenses which rendered a final order of deportation unreviewable by any court. *See* AEDPA § 440(a), 110 Stat. at 1276–77. In addition, AEDPA eliminated the term of imprisonment threshold from the provision barring "aggravated felons" who had served a minimum of five years from applying for relief under section 212(c) of the INA. *See Id.* § 440(d), 110 Stat. at 1277 (making all lawful permanent residents convicted of an "aggravated felony" ineligi-

ble for section 212(c) relief, regardless of the amount of time served)

IIRIRA's contributions to added severity included: a permanent bar to re-entry for "aggravated felons" removed from the United States, *see* IIRIRA § 301(b), 110 Stat. at 3009–575–76; strict limitations on the eligibility of "aggravated felons" sentenced to an aggregate of five years or more for restrictions on removal to a country where life or freedom would be threatened, *see id.* § 305(a), 110 Stat. at 3009–602; ineligibility of "aggravated felons" for extreme family hardship relief under section 212(h) of the INA, *see id.* at § 348, 110 Stat. at 3009–639; and unreviewability of removal orders based on "aggravated felony" convictions, *see id.* § 306(a), 110 Stat. at 3009–607–08.

### B. Discretionary Relief from Deportation

#### 1. Section 212(c) Relief

The history of section 212(c) humanitarian relief and its treatment under the recent immigration statutes and case law are discussed elsewhere in detail. *See, e.g., Pottinger,* 51 F.Supp.2d at 352–53; *Mojica,* 970 F.Supp. at 136–38. As did *Pottinger,* the instant case raises an issue unresolved by the court of appeals for the Second Circuit in *Henderson v. INS,* 157 F.3d 106 (2d Cir.1998): the applicability of AEDPA section 440(d)'s restrictions on 212(c) relief in cases in which deportation was predicated upon pre-AEDPA conduct, but deportation proceedings were not initiated until after AEDPA's enactment.

#### 2. Section 212(h) Relief

Under the law in effect at the time Mr. Maria committed his crime, Section 212(h) of the INA gave the Attorney General discretion to grant a waiver of non drug-related criminal grounds of inadmissibility to any alien who could demonstrate that exclusion "would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son or daughter

of such alien." 8. U.S.C. § 1182(h). Though section 212(h) is phrased in terms of exclusion rather than deportation, courts have held that denying eligibility for 212(h) relief to those aliens who are in deportation—as opposed to exclusion—proceedings violates the Equal Protection Clause. *See, e.g., Yeung v. INS*, 76 F.3d 337, 340–41 (11th Cir.1995) (BIA interpretation of section 212(h) to permit the granting of waivers to aliens in exclusion proceedings but not to those in deportation proceedings violates the Equal Protection Clause); *see also Francis v. INS*, 532 F.2d 268, 273 (2d. Cir.1976) (restricting 212(c) relief to exclusion proceedings was unconstitutional since "[t]he government has failed to suggest any reason why this petitioner's failure to travel abroad following his conviction should be a crucial factor in determining whether he may be permitted to remain in this country").

Section 348(a) of IIRIRA, enacted well after Mr. Maria was convicted, amended section 212(h) to provide that:

> No waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if … the alien has been convicted of an aggravated felony. . . .

110 Stat. at 3009–639. Section 348(b) provided for an effective date of September 30, 1996, the date of IIRIRA's enactment, and made the amendment applicable to "any alien who is in exclusion or deportation proceedings as of such date unless a final administrative order in such proceedings has been entered as of such date." *Id.*

Mr. Maria argues that section 348 violates the Equal Protection Clause by irrationally discriminating between lawful permanent residents, who may not apply for section 212(h) relief if convicted of an "aggravated felony," and other similarly situated aliens, whom section 348 does not bar from applying for such relief. Petitioner also argues that section 348 violates due process prohibitions on retroactive legislation by depriving him of the right to seek relief he would have been entitled to pursue under the law in effect at the time he committed his crime.

### C. Eddy Maria's Situation

Eddy Maria is a twenty-four year-old native of the Dominican Republic. He was admitted to the United States for permanent residence on October 20, 1985, when he was ten years old. Since that time he has lived continuously in the United States.

He attended school in New York City through the 9th grade and subsequently participated in a General Equivalency Diploma (GED) program at his high school. Since leaving school, he has been employed as a restaurant dishwasher, security guard and hotel front desk clerk.

The entire immediate family of Mr. Maria, which includes his parents and six siblings, lives in the United States. Both parents are United States citizens as are two of Mr. Maria's siblings. His remaining siblings are lawful permanent residents.

On February 25, 1996, Mr. Maria was arrested in Queens and charged with participating in a robbery. On June 25, 1996, he pled guilty to attempted unarmed robbery in the second degree and was sentenced to two to four years in prison. All other charges were dropped. Mr. Maria has no other criminal record.

When Mr. Maria committed his crime, a single conviction for attempted robbery in the second degree with a sentence of two to four years did not constitute grounds for deportation. Under then-existing law, there were two ways that a robbery conviction could lead to deportation. One was if the individual had previously committed a crime involving moral turpitude. *See* 8 U.S.C. § 1251(a)(2)(A)(ii) (1994) (amended and redesignated as 8 U.S.C. § 1227(a)(2)(A)(ii) (Supp. II.1996)). The other was if the robbery conviction led to a

sentence of at least five years. *See id.* § 1101(a)(43)(G) (1994) ("aggravated felony" defined as conviction of a theft offense for which the term of imprisonment imposed is at least 5 years); *id.* § 1251(a)(2)(A)(iii) (1994) (an alien convicted of an "aggravated felony" is deportable). Since Mr. Maria received a sentence of less than five years and had no previous convictions, he was not deportable on the basis of his criminal act at the time he committed it.

Even if the offense had been deportable, however, Mr. Maria had a right to apply for humanitarian relief from deportation under what was then INA section 212(c), requiring a showing of good moral character and likely future positive contributions to family and society, and under section 212(h), requiring proof that an alien's deportation would result in exceptional hardship to citizen or legally resident immediate family members. Mr. Maria met the eligibility requirements for section 212(c) relief because he was a lawful permanent resident who had resided legally in the United States for more than seven years and he had not been convicted of an "aggravated felony" for which he had served five years in prison, as was then required for him to be blocked from receiving relief. *See* INA § 212(c), 8 U.S.C. § 1182(c) (1994). He had a right to apply for section 212(h) relief because his parents are United States citizens.

On April 24, 1996, approximately two months after Mr. Maria's arrest and approximately one month before he was convicted, AEDPA was enacted. Section 440(d) of AEDPA barred from section 212(c) relief any alien whose deportability was triggered by conviction of an offense covered in section 241(a)(2)(A)(iii)(A), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) and section 241(a)(2)(A)(i). AEDPA § 440(d), 110 Stat. at 1276 (codified at 8 U.S.C. § 1182(c) (Supp. II 1996)). The bar included anyone convicted of an "aggravated felony," two

crimes involving moral turpitude, and any drug or firearm offense.

As already noted, AEDPA also added new offenses to the definition of "aggravated felony." *See* AEDPA § 440(e), 110 Stat. at 1277–78. The enlarged definition applied only to convictions entered post-AEDPA, and did not, in any event, alter the five-year sentence required for a robbery conviction to be considered an "aggravated felony."

On September 30, 1996, four months after Mr. Maria was convicted, the President signed IIRIRA into law. IIRIRA had a possible impact on Mr. Maria because it expanded the definition of the term "aggravated felony" to include "a theft offense [including an attempt] . . . for which the term of imprisonment [is] at least one year." IIRIRA § 321, 110 Stat. at 3009–627 (codified at 8 U.S.C. § 1101(a)(43)(G) (Supp. II 1996)). Section 321(b) of IIRIRA provided that "[n]otwithstanding any other provision of law (including any effective date), the term ['aggravated felony'] applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph." 110 Stat. at 3009–628 (codified as amended at 8 U.S.C. § 1101(a)(43)(G)).

Among IIRIRA's other innovations was the replacement of section 212(c) relief with an equivalent form of relief from deportation called cancellation of removal. *See* IIRIRA § 304(a), 110 Stat. at 3009–594 (codified as amended at 8 U.S.C. § 1229b (Supp. II 1996)). Section 309 of IIRIRA made this new form of relief available in proceedings commenced on or after April 1, 1997. IIRIRA § 309, 110 Stat. at 3009–625 (codified at 8 U.S.C. § 1229b (Supp. II 1996)). Because Mr. Maria's deportation was initiated prior to April 1, 1997, his eligibility for relief continues, under section 309, to be governed by AEDPA.

Section 348 of IIRIRA, as already discussed, eliminated section 212(h) relief for lawful permanent residents convicted of an

"aggravated felony" in all cases in which no final administrative order had been entered by the date of enactment. IIRIRA § 348, 110 Stat. at 3009–639 (codified at 8 U.S.C. § 1182(h) (Supp. II 1996)). IIRIRA placed no restriction on eligibility for section 212(h) relief for aliens other than lawful permanent residents.

Proceedings were initiated against Mr. Maria early in 1997 while he was still incarcerated. By order to show cause dated February 23, 1997, INS alleged that Mr. Maria was deportable under section 241(a)(2)(A)(iii) due to his conviction of an "aggravated felony" as defined in INA section 101(a)(43).

On May 12, 1997 and July 15, 1997, Mr. Maria's deportation hearing took place. Still a prisoner, Mr. Maria appeared pro se. The immigration judge found that Mr. Maria had been convicted of an "aggravated felony," that he was thus deportable and that he was ineligible for any form of relief from deportation. That same day, Mr. Maria was ordered deported to the Dominican Republic.

On July 27, 1997, still incarcerated and without the aid of an attorney, Mr. Maria filed a notice of appeal of his deportation order, disputing his designation as an "aggravated felon" and referring to the various equities of his case, including his family ties in the United States, good credit history prior to incarceration, lack of a prior criminal record, and his ability to be a productive member of society.

While his case was pending on appeal, Mr. Maria was able to obtain an attorney with the help of his family. His new counsel's request for additional time to submit a brief was denied. The BIA pointed out, however, that the denial did not preclude Mr. Maria from filing a motion to remand.

After having served two years of his sentence, Mr. Maria was released from prison and immediately taken into INS custody on February 23, 1998. He was released by the INS on bond just over one month later, on March 28, 1998.

On April 26, 1998, Mr. Maria's attorney filed a motion to remand for adjustment of status. This motion was denied and Mr. Maria's appeal was dismissed on September 29, 1998. The BIA agreed with the immigration judge that Mr. Maria had been convicted of an "aggravated felony" and was thus both deportable and ineligible for any form of relief from deportation. Petitioner's attorney then filed this petition for a writ of habeas corpus.

## III. LAW

### A. Jurisdiction to Issue a Writ of Habeas Corpus

■ This Court has jurisdiction under section 2241 of title 28 to entertain a petition for habeas corpus to determine whether the continued custody of Mr. Maria is in violation of the Constitution or laws of the United States. *See Henderson v. INS*, 157 F.3d 106, 122 (2d Cir.1998); *Jean–Baptiste v. Reno*, 144 F.3d 212, 220 (2d Cir.1998), *reh'g denied*, 175 F.3d 226, 1999 WL 308512 (2d Cir. May 17, 1999). First, the INA, as amended by AEDPA and IIRIRA, does not preclude habeas corpus review of final deportation orders. *See Jean–Baptiste*, 144 F.3d at 218–19. Second, Mr. Maria, who is subject to a final deportation order, is "in custody" within the contemplation of section 2241. *Daneshvar v. Chauvin*, 644 F.2d 1248, 1251 (8th Cir. 1981); *Mojica*, 970 F.Supp. at 164. Finally, Mr. Maria's claims that the decisions of the immigration judge and the BIA are based on a misreading of AEDPA and IIRIRA, and that, as so interpreted, they violate equal protection, substantive due process and the constitutional prohibition against ex post facto laws, are all cognizable on habeas corpus review. *See Henderson*, 157 F.3d at 117–122.

Because Mr. Maria lives in New York, his hearing was held in New York, and he will be subject to seizure and deportation in and from New York, the proper respondent is the District Director, New York District, United States Immigration and

Naturalization Service. *See Mojica,* 970 F.Supp. at 165. Since respondent's offices are in New York, this Court has personal jurisdiction over him. *See Henderson,* 157 F.3d at 122–128; ·*Mojica,* 970 F.Supp. at 166.

### B. Exhaustion of Administrative Remedies

The doctrine requiring that a party exhaust administrative remedies prior to seeking judicial review is designed to assure that administrative agencies have "a full opportunity to resolve a controversy or correct [their] own errors before judicial intervention." *Sagermark v. INS,* 767 F.2d 645, 648 (9th Cir.1985); *see also Mohammad v. Slattery,* 842 F.Supp. 1553, 1557 (S.D.N.Y.1994); *Chan v. Reno,* No. 95 Civ. 2586, 1997 WL 122783, at *36–37 (S.D.N.Y. Mar. 17, 1997). Exhaustion requirements are satisfied when the agency has in fact ruled on an issue. *See Sagermark,* 767 F.2d at 648 (whether or not the issue was technically before the BIA, the BIA addressed it thoroughly enough). An exception to the exhaustion requirement is appropriate in certain circumstances, such as where administrative appeal would be futile, or where a claimant raises a constitutional claim that could not be resolved through the administrative process. *See Howell v. INS,* 72 F.3d 288, 291 (2d Cir. 1995); *Chan,* 1997 WL 122783, 1997 U.S.Dist. LEXIS 3016, at *27. Mr. Maria raises five arguments in his petition: (1) that the new definition of "aggravated felony" in section 321 of IIRIRA should not be applied retroactively to render him deportable; (2) that the bars to eligibility for section 212(c) relief contained in section 440(d) of AEDPA should not be read to apply to his pre-enactment conviction; (3) that the denial of section 212(c) relief solely because Mr. Maria was in deportation rather than exclusion proceedings is a denial of equal protection; (4) that the denial of section 212(h) relief solely because Mr. Maria was a legal permanent resident and not an undocumented alien is a denial of equal protection; and (5) that retroactive application of the new rules making Mr. Maria deportable and denying him eligibility for section 212(c) and section 212(h) relief is a denial of substantive due process and principles of international law. With respect to each of these claims, the agency either addressed the issue or a recognized exception to exhaustion applies.

Mr. Maria's claims were decided by the Executive Office for Immigration Review (EOIR). The immigration judge ruled expressly that Mr. Maria had been convicted of an "aggravated felony" and was thus ineligible for relief under sections 212(c) and (h) as well as for adjustment of status. On appeal, the BIA stated: "We agree with the Immigration Judge's finding that the respondent is deportable as charged. Similarly, we agree that the respondent did not present eligibility for any form of relief from deportation." Since these matters were ruled on at the administrative level, Mr. Maria has exhausted his administrative remedies.

Mr. Maria appeared pro se at the hearing before the immigration judge and filed a pro se appeal. At the hearing and in his appeal Mr. Maria referred to the equities of his case, including his family relationships, his credit history, his ability to be a productive member of society and his lack of a prior criminal record; he also objected to being classified as having had an "aggravated" charge. These allegations were adequate to present his claims. *Cf. Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (requiring that pro se pleadings be read liberally).

The government's argument that Mr. Maria never presented his claim for relief from deportation to the EOIR and that he is therefore barred from raising it here is without merit. The immigration judge was obliged to consider Mr. Maria's eligibility for section 212(c) relief, and he did, in fact, make findings in that regard. Mr. Maria repeatedly made arguments related to the equities of his case relevant to the 212(c) issue. Given his pro se status, his

arguments were sufficient to present a claim for relief from deportation. Even if this were not the case, the futility of one in Mr. Maria's position making a claim for section 212(c) relief at a time when the Attorney General had already concluded that section 440(d) applied retroactively without respect to the date of the crime, the conviction, or the commencement of administrative proceedings warrants an exception to the exhaustion requirement. See *Matter of Soriano,* Int.Dec. 3289, 1996 WL 426888 (beginning at screen page 37, AG Op. Feb. 21, 1997).

■ An immigration judge is required on his own motion to consider whether a person in deportation proceedings is eligible for relief from deportation. *See United States v. Sanchez–Peralta,* No. 97 Cr. 536, 1998 WL 63405, 1998 U.S.Dist. LEXIS 1660, at *11 (S.D.N.Y. Feb. 13, 1998) (immigration judge is required to inquire into eligibility for section 212(c) relief under 8 C.F.R. § 242.17 (recodified as 8 C.F.R. § 240.49)); *see also United States v. Arce–Hernandez,* 163 F.3d 559, 563 (9th Cir.1998) (immigration judge is required to inquire into eligibility for section 212(h) relief); *Moran–Enriquez v. INS,* 884 F.2d 420, 422 (9th Cir.1989) (same). Failure to make such an inquiry is grounds for a remand to consider an alien's eligibility for relief. *See Moran–Enriquez,* 884 F.2d at 422–23. Appropriately, the regulations theoretically are designed to ensure that so fundamental a matter is not contingent upon the quality of counsel or the sophistication of the person facing deportation. *Cf. Rabiu v. INS,* 41 F.3d 879, 883 (2d Cir.1994) (failure to file section 212(c) application when client is eligible and indicates an interest in pursuing such relief constitutes ineffective assistance of counsel).

In this case, the immigration judge made the required inquiry into Mr. Maria's eligibility for relief. He first determined that Mr. Maria's conviction fit within the new definition of an "aggravated felony." He then concluded that Mr. Ma-

ria was not eligible for any form of relief. The judge stated: "He is not eligible for 212(c)" and "you are legally barred from staying here; not by [me] but by the law itself."

On appeal, as already noted, the BIA concurred:

> We agree with the Immigration Judge that the respondent's conviction for attempted robbery in the second degree is an aggravated felony. Based on the foregoing, we agree with the Immigration Judge's finding that the respondent is deportable as charged. Similarly, we agree that the respondent did not present eligibility for any form of relief from deportation.

Because the immigration judge and the BIA addressed the issue of Mr. Maria's eligibility for section 212(c) relief, it does not matter whether Mr. Maria raised the question. *See Sagermark,* 767 F.2d at 648 (exhaustion was satisfied because the BIA addressed the issues sufficiently to vindicate policy concerns underlying the exhaustion doctrine).

Mr. Maria raised the issue of equitable relief before the immigration judge and on appeal to the BIA. At the hearing before the immigration judge, he said that he had "made a big mistake" and that he did not know anyone in the Dominican Republic. In his Notice of Appeal, he wrote that his family is in the United States, that his conviction was his first offense, that he had learned a lot, that he had maintained a good credit history, and that he had completed a program for substance abuse. Each of these arguments concerned factors that Mr. Maria thought should be considered in his case even though the immigration judge had categorically stated that he was. ineligible for relief. Moreover, it is apparent from the record that Mr. Maria *prima facie* met the basic eligibility requirements for section 212(c) relief under pre-AEDPA law. He had entered the country in 1985 as a lawful permanent resident, thus satisfying the requirement

of seven years of lawful residence. The immigration judge observed that Maria has been a legal resident for over 11 years.

Given that Mr. Maria was a pro se litigant, the equities he raised at his hearing and in his appeal would have been sufficient to present his claim for equitable relief even if the immigration judge and the BIA were not affirmatively required to inquire into the matter. *See, e.g., Haines v. Kerner,* 404 U.S. at 520–21, 92 S.Ct. 594 (pro se pleadings held to "less stringent standards"); *Parris v. Coughlin,* No. 90 CV 414, 1993 WL 328199, at *4 (N.D.N.Y. Aug.4, 1993) ("it is the duty of the court to construe a pro se inmate's complaint liberally").

Mr. Maria did not retain counsel until after he had appealed. His counsel then sought and was denied leave for an extension of time in which to file a brief. Counsel also sought a remand in light of Mr. Maria's mother's approved visa petition. There was no reason to further exhaust by seeking a remand on the issue of eligibility for section 212(c) relief.

Finally, the futility exception to exhaustion applies in this case. On September 12, 1996, the Attorney General asserted jurisdiction over the question whether section 440(d) should be applied retroactively. On February 21, 1997, three days before the INS commenced proceedings against Mr. Maria, the Attorney General issued her decision concluding that section 440(d) of AEDPA should be applied retroactively. *See id.* This decision of the Attorney General was binding on the BIA. *See Henderson,* 157 F.3d at 109–10 (Attorney General has statutory authority over all of INS). Therefore, the immigration judge and the BIA would have had to deny Mr. Maria 212(c) relief.

Anything that Mr. Maria could have said or done before the BIA with respect to section 212(c) would, therefore, have had no effect. Relief available to him within the administrative process had been blocked by the Attorney General. *See El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review,* 959 F.2d 742, 747–48 (9th Cir.1991) ("[W]here the agency's position on the issue appears already set and it is very likely what the result of recourse to administrative remedies would be, such recourse would be futile and is not required." (citation and internal quotation marks omitted)); *Grant v. Zemski,* 54 F.Supp.2d 437, 445 (E.D.Pa. 1999) (exhaustion would be futile where BIA had "predetermined" issue).

The case cited by the government for the proposition that Mr. Maria failed to exhaust his administrative remedies, *Correa v. Thornburgh,* 901 F.2d 1166 (2d Cir. 1990), is inapposite. In that case, the appellant had been represented by counsel throughout her administrative proceeding. Moreover, while she had argued before the immigration judge that she was not excludable, she attempted to argue on appeal that she had in fact "entered" the United States and should therefore have been placed in deportation rather than exclusion proceedings. The court found that this argument had not been raised before the agency and thus could not be raised on appeal. In contrast, the issue of Mr. Maria's eligibility for section 212(c) relief was addressed before the agency. *Cf. Mohammad,* 842 F.Supp. at 1557 (distinguishing *Correa* as a case involving a claim not raised before the BIA that would have triggered a different section of the immigration statute). Moreover, unlike the instant case, *Correa* involved factual issues that would have benefitted from the development of an administrative record.

Mr. Maria's deportability as an "aggravated felon" was also addressed by both the immigration judge and the BIA. The immigration judge rested his ruling of deportability on the finding that Mr. Maria had been convicted of an "aggravated felony" after his admission to the United States. The BIA found that Mr. Maria's second degree robbery conviction rendered him deportable under section 1101(a)(43)(G) of title 8, the provision of

the INA codifying IIRIRA's "aggravated felony" amendments. Presumably these findings represented the BIA's and the immigration judge's conclusions that IIRIRA section 321 applied to Mr. Maria's pre-enactment conviction.

Mr. Maria's equal protection arguments fall within the exception to exhaustion for constitutional claims. *See Howell,* 72 F.3d at 291; *Cabreja–Rojas v. Reno,* 999 F.Supp. 493, 496 (S.D.N.Y.1998). Both of Mr. Maria's equal protection arguments are based on the unequal treatment required by statutory provisions. Mr. Maria claims that (1) he was denied section 212(c) relief solely because he had not traveled outside the country and thus had been placed in deportation rather than exclusion proceedings, and (2) that he was denied section 212(h) relief solely because he was a legal permanent resident and not an undocumented alien. Neither of these issues could have been decided by an immigration judge or the BIA. The BIA has made clear that it is not authorized to rule on equal protection challenges to statutory forms of discrimination. *See Matter of Fuentes–Campos,* Int.Dec. 3319 (BIA May 14, 1997) (explaining that BIA could not rule on argument that section 440(d) violates equal protection). Under these circumstances, there is no requirement for further exhaustion of administrative remedies. *See Chan v. Reno,* 1997 WL 122783, 1997 U.S.Dist., LEXIS 3016, at *28 ("because the INS is not competent to hear the claims raised by the ... Complaint, there is no genuine opportunity for adequate relief through the administrative process and pursuing that process would be futile").

Mr. Maria's substantive due process arguments were also outside the range of issues on which the administrative agency could rule. To the extent that these issues are intertwined with Mr. Maria's statutory claims, the agency either ruled on or had ample opportunity to reach them.

C. IIRIRA's "Aggravated Felony" Amendments Render Mr. Maria Deportable

1. Statutory Design

a. Temporal Reach of "Aggravated Felony" Definitions from the ADAA to IIRIRA

■ The first "aggravated felony" definition was silent as to temporal reach. *See* ADAA § 7342, 102 Stat at 4469–70. An "Applicability Date" was provided, however, in the section making conviction of an "aggravated felony" deportable. It made this new deportation ground applicable "to any alien who has been convicted, on or after the date of the enactment of this Act, of an 'aggravated felony.'" *Id.* § 7244, 102 Stat. at 4471.

Prior to IIRIRA, statutes adding to the list of "aggravated felonies" excluded pre-enactment convictions—and, in one case, pre-enactment conduct—from their reach. *See* IMMACT § 501(b), 104 Stat. at 5048 ("The amendments ... shall apply to *offenses committed on or after the date of the enactment of this Act,* except that the amendments made by paragraphs (2) and (5) of subsection (a) shall be effective as if included in ... the Anti–Drug Abuse Act of 1988." (emphasis added)); INTCA § 222(b), 108 Stat. at 4322 ("The amendments made by this section shall apply to *convictions entered on or after the date of enactment of this Act*" (emphasis added)); AEDPA § 440(f), 110 Stat. at 1278 ("The amendments made by subsection (e) shall apply to *convictions entered on or after the date of the enactment of this Act,* except that the amendment made by subsection (e)(3) shall take effect as if included in the enactment of section 222 of the Immigration and Nationality Technical Corrections Act of 1994." (emphasis added)).

IIRIRA altered this pattern of prospective applicability. Section 321(b) of the Act, entitled "Effective Date of Definition," added to the new "aggravated felony" definition the sentence: "Notwithstanding any other provision of law (including any effec-

tive date), the term applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph." 110 Stat. at 3009–628 (codified at 8 U.S.C. § 1101(a)(43) (Supp. II 1996)). Section 321(c), entitled "Effective Date" adds: "The amendments made by this [aggravated felony] section shall apply to actions taken on or after the date of the enactment of this Act regardless of when the conviction occurred." *Id.*

b. Temporal Reach of IIRIRA Section 321

Courts considering the applicability of section 321 to pre-IIRIRA convictions of IIRIRA-defined "aggravated felonies" have interpreted sections 321(b) and (c) to mean that "it doesn't matter when the conviction occurred if the IIRIRA 'aggravated felony' amendments apply," *Valderrama-Fonseca v. INS*, 116 F.3d 853, 856 (9th Cir.1997), and that the amendments apply where "action" is deemed to have been "taken" on or after September 30, 1996, IIRIRA's effective date. *See, e.g., Ortiz v. INS*, 179 F.3d 1148, 1155 (9th Cir.1999) ("[W]hether the 'aggravated felony' amendments are triggered in this case depends on whether there was an 'action' taken on or after September 30, 1996, the effective date of the amended definition."); *Xiong v. INS*, 173 F.3d 601, 607 (7th Cir. 1999) ("action taken" after IIRIRA's enactment date triggered section 321's applicability to petitioner's 1995 conviction of an offense not then defined as an "aggravated felony"); *Choeum v. INS*, 129 F.3d 29, 37 (1st Cir.1997) (section 321 did not apply to petitioner's pre-enactment kidnapping conviction because "action" was taken in her case prior to IIRIRA's enactment); *Valderrama-Fonseca*, 116 F.3d at 857 (no "actions taken" after IIRIRA's enactment date triggered section 321).

"Actions taken" under section 321(c) include "actions and decisions of the Attorney General acting through an immigration judge or the BIA." *Xiong*, 173 F.3d at 607; *see also Choeum*, 129 F.3d at 37.

*Compare Valderrama-Fonseca*, 116 F.3d at 857 (review by court of appeals was not a post-IIRIRA "action taken" that would trigger section 321), *with Mendez-Morales v. INS*, 119 F.3d 738 (8th Cir.1997) (per curiam) (even judicial review of a deportation order by a court of appeals is an "action taken"). Because INS took "action" against Mr. Maria six months after IIRIRA's adoption, his second degree attempted robbery conviction comes within section 321.

Mr. Maria concedes that section 321 reaches his pre-enactment conviction. He argues, however, that a distinction should be made between the temporal reach of section 321—the "aggravated felony" *definition*—and that of individual provisions attaching immigration *consequences* to an "aggravated felony" conviction. These consequences are numerous and include deportability, *see* 8 U.S.C. § 1227(a)(2)(A)(iii) (Supp. II 1996), expedited removal, *see id.* § 1228 (Supp. II 1996), disqualification from relief from deportation, AEDPA § 440(d), 110 Stat. at 1277, *repealed by* IIRIRA § 304(a), 110 Stat. at 3009–594 (codified at 8 U.S.C. § 1229b(a)(3) (Supp. II 1996)), ineligibility for a waiver of inadmissibility, *see* 8 U.S.C. § 1182(h) (Supp. II 1996), and restrictions on judicial review, *see id.* § 1252(a)(2)(C), and on eligibility for asylum, *see id.* § 1158(b)(2)(B) (Supp. II 1996). Whether the statute was designed to attach any one of these consequences retroactively to offenses it defined as "aggravated felonies" cannot, petitioner argues, be determined by reference to section 321. Rather, a separate clear statement of congressional intent retroactively to attach the particular consequence or disability at issue—in this instance deportability—is required.

This argument is not persuasive. Since IIRIRA contains no such statements, accepting Mr. Maria's position as to deportability would frustrate whatever retroactive design section 321 does have. Deportability is a "consequence" quite different from other "aggravated felony" effects. It func-

tions as a sort of master switch, activating the potential for a host of adverse immigration consequences. *See Part* II.A.2, *supra.* Those consequences specifically mandated by IIRIRA in connection with "aggravated felony" convictions include: a permanent bar on re-entry to the United States, *see* IIRIRA § 301(a), 110 Stat. at 3009–576, mandatory detention, *see id.* § 303(a), 110 Stat. at 3009–585, ineligibility for various forms of removal relief, *see id.* § 304(a), 110 Stat. at 3009–594, restrictions on the availability of relief from removal to a country where an alien's life or freedom would be jeopardized, *see id.* § 305(a), 110 Stat. at 3009–602, preclusion of judicial review of final removal orders, *see id.* § 306(a), 110 Stat. at 3009–607–08, and a bar on section 212(h) relief, *see id.* § 348, 110 Stat. at 3009–639. Because these consequences are all predicated on deportability, if section 321 of IIRIRA does not sustain a finding that Mr. Maria is deportable, it can have no practical impact on him or on any alien who, like him was rendered deportable by a pre-IIRIRA conviction of an IIRIRA-defined "aggravated felony." Given the plainly retroactive language of sections 321(b) and (c) and the fact that this language constitutes a marked departure from the prospectivity of prior expansions of the "aggravated felony" definition, it is highly unlikely that Congress planned such a non-productive result.

A version of the definition-consequences distinction petitioner urges has been endorsed by a number of commentators in the context of pre-ADAA convictions of crimes defined as "aggravated felonies" by the ADAA. *See, e.g.,* Juan P. Osuna, *The 1996 Immigration Act: Criminal Aliens and Terrorists,* 73 Interpreter Releases No. 47, 1713, 1716 (Dec. 16, 1996); Richard L. Prinz, *The 1996 Criminal Alien Legislation in 1997: An Overview, in Practice Under IIRIRA: One Year Later* 205, 210 (R. Patrick Murphy ed., 1997); Nadine Wettstein, *The 1996 Immigration Reform Act's Effective Dates and the Applicability of the New Law: The Nightmare that*

*Continues After You Wake Up, in Introducing the 1996 Immigration Reform Act* 232, 241–42 (R. Patrick Murphy ed., 1996); *see also Lettman v. Reno,* 168 F.3d 463 (11th Cir.1999), *petition for reh'g granted and opinion vacated,* Nos. 97–5283, 98–5767, 1999 WL 652319 (11th Cir. Aug. 25, 1999). The analysis of these commentators depends on the unique structure of the ADAA and the fact that ADAA section 7344, which made conviction of an "aggravated felony" deportable, expressly limited its applicability to convictions entered after the statute's November, 1988 effective date. Their approach is inapposite in the current context, involving as it does an offense retroactively defined as an "aggravated felony" by IIRIRA and a deportability provision lacking the temporal restriction of ADAA section 7344. *See* 8 U.S.C. § 1227 (Supp. II 1996).

The conclusion reasonably to be deduced from IIRIRA's overall pattern and language is that section 321 was meant to apply retroactively wherever the term "aggravated felony" was used, subject to the temporal restrictions—express or implied—of individual provision attaching "aggravated felony" consequences. Since no such temporal restriction exists or is to be implied from the provision declaring aliens convicted of "aggravated felonies" to be deportable, Mr. Maria is deportable as an "aggravated felon." *See, e.g., Bazuaye v. INS,* No. 97 Civ. 1280, 1997 WL 122768, 1997 U.S.Dist. LEXIS 2996, at *5 (S.D.N.Y. March 18, 1997) ("by its plain terms IIRIRA provides that plaintiff is now considered an 'aggravated felon' and therefore deportable because of his 1992 conviction"); *see also* Nancy Morawetz, *Rethinking Retroactive Deportation Laws and the Due Process Clause,* 73 N.Y.U.L.Rev. 97, 155 (1998) ("IIRIRA means that some who were not deportable in the past are now deportable as aggravated felons"); Bruce Robert Marley, Comment, *Exiling the New Felons: The Consequences of the Retroactive Application of Aggravated Felony Convictions to*

*Lawful Permanent Residents,* 35 San Diego L.Rev. 855, 889 (1998) (IIRIRA makes past conduct a deportable offense); Coonan, *supra,* 12 Geo.Immigr.L.J. at 590 (because section 321 applies retroactively "offenses committed decades ago that were not aggravated felonies at the time—in many instances were simple misdemeanors—now comprise grounds of deportability").

The *Landgraf* presumption against retroactivity does not operate as to deportability in light of Congress's choice of clear statutory language. *See Landgraf v. USI Film Products,* 511 U.S. 244, 266, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Whether carrying out Congress's statutory program in this regard would offend the requirements of the Due Process Clause is addressed in the next section.

Of course "it impresses . . . as unfair now to construe his plea as an admission that he was guilty of a 'crime' [with implications for deportation penalties] more broad than" those then in force. *People v. Olah,* 300 N.Y. 96, 101, 89 N.E.2d 329, 331 (1949). In the instant case, however, so long as there is an escape from this inequity through a humanitarian hearing, *see* Part III.D, *infra,* no unconstitutionality has been shown.

2. The Constitution Does Not Prevent Application of Section 321 to Render Mr. Maria Deportable

a. Due Process Clause

 The constitutionality of retroactive legislation "has been conditioned upon a rationality requirement beyond that applied to other legislation." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 223, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring); *see also Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) ("retroactive legislation does have to meet a burden not faced by legislation that has only future effects"). Where legislation has both prospective and retroactive characteristics, each of these features must be independently justifiable as rational means of furthering a legitimate legislative purpose. A purpose sufficient to justify the future effects of a law will not necessarily support its retroactive ones. *See Pension Benefit Guar. Corp.,* 467 U.S. at 730, 104 S.Ct. 2709; *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16–17, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

A more stringent standard of rationality review may be appropriate in the criminal alien context:

[T]he deportation cases present retroactivity in a context in which the targeted group suffers the dual political disability of being made up of immigrants and persons convicted of crimes. As an unpopular group, it is vulnerable in the political process and unlikely to be able to voice its interests effectively. The Court is therefore appropriately cast into a more active role in protecting the basic concept that people should have fair warning of the consequences of their conduct and that unpopular groups should not be targeted unfairly through retroactive legislation.

Morawetz, *supra,* 73 N.Y.U.L.Rev. at 146–47.

In a recent case, *Eastern Enters. v. Apfel,* the Supreme Court considered a due process challenge to a retroactive statute. *See* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). Although the case was decided under the Takings Clause and no opinion commanded a majority of the Court, the opinions overall evince a serious concern with retroactivity. Commenting on the Court's substantive due process case law, Justice Kennedy stated that "[t]hese cases reflect our recognition that retroactive lawmaking is a particular concern for the courts because of the legislative 'tempt[ation] to use retroactive legislation as a means of retribution against unpopular groups or individuals.'" *Id.* 118 S.Ct. at 2159 (Kennedy, J., concurring) (quoting *Landgraf v. USI Film Products,*

511 U.S. 244, 266, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)).

The harshness and oppressiveness of a measure enters into the due process-rationality calculus. *See, e.g., id.* at 2149 ("Our [Due Process and Takings] decisions have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience."); *Pension Benefit Guar. Corp.,* 467 U.S. at 727, 104 S.Ct. 2709 ("retrospective civil legislation may offend due process if it is 'particularly harsh and oppressive'" (quoting *Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 83 L.Ed. 87 (1938))); Morawetz, *supra,* 73 N.Y.U.L.Rev. at 138–39 ("In evaluating whether specific rationales justify retroactivity, the Court's decisions also suggest that there must be attention to the severity of the consequences of retroactivity.").

The demographic principle, applied to rising levels of immigration beginning in the 1980's naturally led to an expected corresponding increase in the numbers— but probably not in the small percentage— of aliens committing crimes. It is probably the foreign-based drug trade that largely explains a ten-fold increase, between 1980 and 1997, in the number of criminal aliens in custody or under other forms of law enforcement supervision. *See* Peter H. Schuck & John Williams, *Removing Criminal Aliens: The Pitfalls and Promises of Federalism,* 22 Harv.J.L. & Pub. Pol'y 367, 381 (1999) (tables showing ten-fold increase). Although the majority of criminal aliens are here illegally and are removable on that basis alone, *see* 8 U.S.C. § 1227(a)(1), a not insubstantial number, varying from state to state, are lawful permanent residents, *see* Schuck & Williams, *supra,* 22 Harv.J.L. & Pub. Pol'y at 382 ("[R]ough data ... indicate that LPR's make up considerably less than a third of the population of removable criminal aliens in state prisons. Officials esti-

mate that over seventy-five percent of removable criminal aliens in border states such as California and Texas are not in the country legally, whereas a majority in other major receiving states such as New York may be LPR's.").

Congress began to focus on the problem of alien criminal activity in the mid 1980's. *See id.* at 425. Beginning with the ADAA in 1988 and culminating with AEDPA and IIRIRA in 1996, it enacted the series of laws already referred to in Part II. These were designed in part to enlarge the ranks of deportable criminal aliens and to expedite the deportation process. *See generally* Brent K. Newcomb, Comment, *Immigration Law and the Criminal Alien: A Comparison of Policies for Arbitrary Deportations of Legal Permanent Residents Convicted of Aggravated Felonies,* 51 Okla. L.Rev. 697, 702–04 (1998) (legislative intent and debate); *see also* Coonan, *supra,* 12 Geo.Immigr.L.J. at 590 ("The congressional architects of the 1996 legislation made amply clear their intention of targeting criminal aliens for expedited deportation from the United States."). Prospectively designating as deportable those aliens coming within IIRIRA's expanded "aggravated felony" definition rationally furthers the first of these two legitimate goals—that of deporting more criminal aliens. Retrospective deportability may be justified on the same basis.

■ Labeling Mr. Maria as deportable on the basis of a conviction, which, when entered, was not an "aggravated felony" and which was not otherwise a basis for deportation, nevertheless has the aura of a due process violation. There is a justifiable basis for the sense of aggrievement likely to be experienced by anyone subjected to such retroactivity. Yet, Congress might reasonably have believed that making persons in Mr. Maria's position deportable—which in and of itself has no greater effect than creating the potential for them to be deported pursuant to other statutory provisions—was an appropriate means of advancing its goal of deporting greater

numbers of aliens with criminal propensities. The due process implications of the retroactive imposition of consequences other than deportability must be analyzed separately.

The retroactive application of IIRIRA's "aggravated felony" bar to cancellation of removal relief, see 8 U.S.C. § 1229b(a)(3) (Supp. II 1996), would, arguably, not satisfy the requirements of due process. This is particularly true in the case of aliens whose offenses were defined post-conviction as "aggravated felonies." It has been suggested that "[b]y sweeping in crimes that were not even grounds for deportation under the old law, the aggravated felony bar [on relief from deportation] means that persons who have entered pleas, or otherwise conducted their criminal cases with the expectation of being able to continue to live in the United States, will now be deported summarily." Morawetz, supra, 73 N.Y.U.L.Rev. at 156. Retroactively designating such persons deportable may be harsh, but is, as already discussed, justifiable; rendering them summarily so, arguably, is not.

The dubious rationale for retroactively depriving lawful permanent residents whose crimes were committed long ago, and who have long since established productive lives in their communities, of their right to apply for humanitarian relief from deportation was addressed in this court's opinion in *Mojica*, 970 F.Supp. at 171. The frustration of expectations and of the individual's and society's interest in achieving a sense of repose, both of which lie at the heart of the antiretroactivity principle, are most poignantly implicated in such cases. There is a litany of sympathetic stories about longstanding lawful residents rendered deportable and denied a hearing on the basis of minor crimes, in some cases committed years before and of little relevance to current character in view of subsequent lifestyles and family circumstances. *See, e.g.*, Rafael Alvarez, *Immigration Law Delays Plans for Transplant; Revision in 1996 Makes Mis-demeanor an "Aggravated Felony"*, Baltimore Sun, Aug. 13, 1998, at 1B (lawful resident of ten years' standing rendered deportable as an "aggravated felon" due to a 1994 no contest plea to stealing $59 dollars worth of drapes and one-year sentence of supervised probation); Elizabeth Kurylo, *Nigerian Woman Faces Deportation; Retroactive Change in INS Crime Policy Threatens ... Legal Immigrants in Atlanta*, Atlanta Constitution, June 12, 1998, at 1C (legal immigrant deportable as an "aggravated felon" due to sentence of 12 months probation in connection with guilty plea five years ago to shoplifting a baby outfit she says she was trying to return); Susan Taylor Martin, *Retroactive Punishment: After Prison, Immigrant Pays Again for Criminal Act*, St. Petersburg Times, July 19, 1998, at 10A (lawful resident convicted and sentenced to two years in prison for having consensual sex at eighteen with a twelve year old girl he thought was sixteen deportable under IIRIRA as an "aggravated felon"); Patrick J. McDonnell, *Deportation Shatters Family*, L.A. Times, Mar. 14, 1998, at B1 (suicide of son after father was deported to Colombia as an "aggravated felon" due to a 1989 $10 drug sale). Allowing long term residents to present the equities of their cases alleviates the harshness of retroactive deportability while at the same time allowing Congress to meet its goal of expeditiously deporting aliens who have shown character defects and resulting dangers to our society by committing crimes here.

As indicated in Parts III.D and V, *infra*, AEDPA section 440(d) and the new permanent "aggravated felony" bar which replaces it, see 8 U.S.C. 1229b(a)(3) (Supp. II 1996), should be interpreted to avoid offending due process principles. In this way, the retroactivity-rationality issues powerfully implicated by any attempt to deny Mr. Maria and others in his position humanitarian relief can be avoided.

b. Ex Post Facto Clause

The Ex Post Facto Clause is one of several constitutional provisions em-

bodying the fundamental principle of antiretroactivity. *See, e.g., Lynce v. Mathis,* 519 U.S. 433, 440, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997); *Landgraf,* 511 U.S. at 246, 114 S.Ct. 1483. The relevance of ex post facto case law to the evaluation of a civil statute's retroactive effect is well established. *See, e.g., Pottinger,* 51 F.Supp.2d at 362 (citing cases). It is not, however, an independent basis for striking down a deportation statute on retroactivity grounds.

Historically, courts have presumed that deportation does not implicate the Ex Post Facto Clause because it is a "civil" matter. *See, e.g., Marcello v. Bonds,* 349 U.S. 302, 314, 75 S.Ct. 757, 99 L.Ed. 1107 (1955) (no reason to depart from precedent that Ex Post Facto Clause does not apply to deportation); *Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954) (refusing to apply Ex Post Facto Clause to a deportation statute); *Bugajewitz v. Adams,* 228 U.S. 585, 591, 33 S.Ct. 607, 57 L.Ed. 978 (1913) (prohibition against ex post facto laws had no application to a statute that made prostitution grounds for deportation).

This civil classification has not without reason been condemned as resting on the legal fiction that deportation is not punishment. *See Galvan,* 347 U.S. at 531, 74 S.Ct. 737 ("the intrinsic consequences of deportation are ... close to punishment for crime"); *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948) ("deportation is a drastic measure and at times the equivalent of banishment or exile"); *Lok v. INS,* 548 F.2d 37, 39 (2d Cir.1977) (deportation is a "sanction which in severity surpasses all but the most Draconian criminal penalties").

Several features of the current statutory scheme illustrate the quasi-penal character of deportation. INA section 238(c) provides for the issuance of judicial orders of removal at the time of a deportable alien's sentencing. *See* 8 U.S.C. § 1228(c)(1) (Supp. II 1996). In addition, courts may factor in an alien's willingness to accept deportation at sentencing. *See, e.g., Unit-*

ed States v. Galvez–Falconi, 174 F.3d 255, 260 (2d Cir. 1999) (stating conditions under which sentencing court may consider alien's consent to deportation). Other provisions mandate that "special removal proceedings" be made available at certain federal, state and local correctional facilities for aliens convicted of "aggravated felonies" and other designated offenses, *see* 8 U.S.C. § 1228(a)(1) (Supp. II 1996), and that the removal proceedings of "aggravated felons" be expedited by initiating them, where possible, prior to their release from incarceration. *See id.* § 1228(a)(3) (Supp. II 1996). Particularly disturbing is the difficulty of adequate legal representation in such a situation, as demonstrated by Mr. Maria's case. He was not able to obtain counsel until his appeal.

In some respects, the current deportation scheme arguably was intended to, and in fact, does operate as punishment. *See, e.g., Scheidemann v. INS,* 83 F.3d 1517, 1526–31 (3d Cir.1996) (Sarokin, J., concurring); *see also* 142 Cong.Rec. S4600 (daily ed. May 2, 1996) (statement of Sen. Roth) ("The bill broadens the definition of aggravated felon to include more crimes punishable by deportation."). Yet, the line of precedent establishing deportation as nonpunitive remains in place and precludes a finding that the Ex Post Facto Clause per se has been violated in the instant case absent a review by the Supreme Court. *But cf. Eastern Enters. v. Apfel,* 524 U.S. 498, 118 S.Ct. at 2154, 141 L.Ed.2d 451 (Thomas, J., concurring) (noting dubiousness of limiting Ex Post Facto Clause to criminal context and willingness to revisit issue of its applicability in an appropriate civil case); Hakeem Ishola, *Of Convictions and Removal: The Impact of the New Immigration Law on Criminal Aliens,* 10–AUG Utah B.J. 18, 33 (1997) (characterizing section 321 as "the mother of all ex post facto laws").

**D.** AEDPA's Restrictions on Section 212(c) Relief Do Not Apply to Acts Before Enactment

█ *Mojica* noted that application of new statutes to past criminal acts raises

serious retroactivity issues. *See* 970 F.Supp. at 175. It did not, however, decide whether section 440(d) applies to a person whose crime was committed prior to AEDPA's enactment, a question similarly left open by the court of appeals for the Second Circuit in *Henderson,* 157 F.3d at 128 n. 28. In *Henderson,* the court declined to reach the issue of section 440(d)'s "appli[cability] to primary conduct—i.e. criminal convictions—that occurred prior to [AEDPA's enactment date]." *Id.* It limited its holding to the inapplicability of section 440(d) to those cases in which deportation proceedings were underway at the time AEDPA was enacted. *Accord Mayers v. INS,* 175 F.3d 1289, 1304 (11th Cir.1999); *Sandoval v. Reno,* 166 F.3d 225 (3d Cir.1999) (same); *Goncalves v. Reno,* 144 F.3d 110, 126 (1st Cir.1998), *cert. denied sub nom. Reno v. Pereira Goncalves,* —— U.S. ——, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999) (same). *But cf. La-Guerre v. Reno,* 164 F.3d 1035, 1041 (7th Cir.1998) (dicta rejecting arguments against retroactivity).

The issue left open by *Henderson* was also presented in the recent case of *Pottinger,* 51 F.Supp.2d at 349. In that case, as in the case of Mr. Maria, deportation proceedings were commenced after AEDPA's adoption. Mr. Maria, like Mr. Pottinger and the petitioners in *Mojica,* Mr. Mojica and Mr. Navas, committed his crime before AEDPA was signed into law. Unlike Mr. Pottinger, Mr. Mojica and Mr. Navas, however, Mr. Maria pled guilty after the statute's enactment. As noted in *Pottinger,* neither the post-enactment initiation of deportation proceedings nor a post-enactment conviction warrants retroactive application of section 440(d) to deny a section 212(c) hearing. *See Pottinger,* 51 F.Supp.2d at 354–55.

In view of the fact that Mr. Maria's right to a section 212(c) hearing may be resolved on statutory grounds, it is not necessary to decide whether a § 212(c) hearing would be independently required as a matter of constitutional or international law. Nor need it now be decided whether the Constitution or international obligations would mandate a humanitarian hearing in a case in which a lawful permanent resident commits an "aggravated felony" post-enactment.

1. Statutory Language Does Not Support Retroactivity

The first step in analyzing a statute's temporal reach is to determine whether Congress has demonstrated its design in that regard. In doing so, the court is to use "normal rules of construction." *Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The government's position is not entitled to deference. *See Pottinger,* 51 F.Supp.2d at 359 (deference inappropriate where issue is purely one of statutory construction (citing *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987))); *Mojica,* 970 F.Supp. at 180–81 (same).

■ Silence alone does not imply ambiguity. *See Henderson,* 157 F.3d at 130. In assessing the meaning of a provision that is silent as to retroactivity, the statute as a whole must be analyzed and Congress's treatment of comparable provisions evaluated. If Congress has used specific language to apply some provisions retroactively, its silence in others is evidence that it did not mean them to be applied retroactively. *See Lindh,* 521 U.S. at 326–34, 117 S.Ct. 2059 (finding, by negative implication, that Congress did not wish to apply certain amendments to habeas statute retroactively).

Section 440(d) of AEDPA amended section 212(c) to exclude from eligibility for relief any person who

is deportable by reason of having committed any offense covered in section 241(a)(2)(A)(iii)(A), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i).

AEDPA § 440(d), 110 Stat. at 1277. No specific language of retroactive applicability was included.

Throughout the rest of Title IV of AEDPA, in contrast, Congress used precise language when it chose to apply new rules to prior conduct, describing the degree of retroactivity with great specificity. In addition to section 440(d), there are two provisions in Title IV that eliminate statutory eligibility for relief from deportation. Section 413 provides that persons excludable or deportable due to their engagement in terrorist activity are no longer eligible for withholding of deportation, suspension of deportation, voluntary departure, adjustment of status or registry. *See* AEDPA § 413(a)–(e), 110 Stat. at 1269. Section 421(a) makes such persons ineligible for asylum. *See id.* § 421(a), 110 Stat. at 1270.

All three of these relief-restricting provisions recognize that the central action that makes a person deportable is the conduct in which he or she engaged. Sections 413 and 421(a) apply to a person who is deemed an "alien terrorist," which means any alien who "has engaged, is engaged, or at any time after admission engages in any terrorist activity." *See* AEDPA §§ 413, 421(a), 110 Stat. at 1268–70. By contrast, section 440(d) applies to a person who is deportable "by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C) or (D)." *Id.* § 440(d), 110 Stat. at 1277.

Sections 413 and 421(a)—the terrorist provisions—are explicitly retroactive. Section 413(g) states that the amendments apply to any person denominated a "terrorist" so long as there has not been a final adjudication of that person's application for relief before the date of enactment. AEDPA § 413(g), 110 Stat. at 1269–70. Thus, regardless of when the conduct took place, if the government has not yet adjudicated, for example, an application for suspension of deportation, the terrorist alien can no longer apply for that form of relief.

Similarly, section 421(b) states that the amendments apply to an asylum application for which there has not yet been a final determination before the date of enactment. *See* AEDPA § 421(b), 110 Stat. at 1270. As with section 413(g), this language means that a person who has engaged in terrorist activity, but who has not yet received a final grant of asylum, is no longer eligible for such relief.

In contrast to the specific language of sections 413(g) and 421(b), section 440(d) contains no language indicating an intent retroactively to eliminate a long term lawful permanent resident's eligibility for relief from deportation. Under these circumstances, silence is not ambiguous. Rather, it amounts to an affirmative statement that the bars to relief in section 440(d) should not be applied retroactively. *See Henderson,* 157 F.3d at 130; *see also Mayers,* 175 F.3d at 1302–03 (holding that Congress's silence on issue of retroactivity of section 440(d) in face of explicit retroactivity provisions in other parts of AEDPA indicates that section 440(d) does not apply to cases pending on the date of enactment); *Sandoval,* 166 F.3d at 225 (same); *Goncalves,* 144 F.3d at 128–31 (same). *But cf. LaGuerre,* 164 F.3d at 1041 (suggesting, in *dicta,* that section 440(d) is ambiguous).

Other provisions of Title IV provide further evidence of Congress's awareness of the need to use specific language to impose changes in the law retroactively. *See Mojica,* 970 F.Supp. at 172–73. Specific retroactivity language was included in sections 401(f), 435(b), 440(f), and 441(b) of AEDPA. *See Mojica,* 970 F.Supp. at 172–73 (setting forth the text of each of these provisions). Section 401 is the general provision for applicability of the new procedures for removal of "alien terrorists." *Id.* § 401, 110 Stat. at 1258. Section 401(f) provides that the amendments made by section 401 apply retroactively "without regard to the date of entry or attempted entry into the United States." *Id.* § 401(f), 110 Stat. at 1258.

Section 435(b) applies AEDPA's expanded criteria of deportability, for crimes of moral turpitude to persons against whom deportation proceedings are commenced after the enactment of AEDPA. *See id.* § 435(b), 110 Stat. at 1274. Under this provision, pre-AEDPA criminal activity that previously would not have made a person deportable now made him or her deportable. Section 435(b) is not fully retroactive, as are the provisions related to "alien terrorists," because it does not apply to aliens in deportation proceedings at the time of AEDPA's adoption.

Section 440(f) retroactively applies AEDPA's changes to the definition of "aggravated felony" to persons whose conduct occurred before the enactment of AEDPA. *See id.* § 440(f), 110 Stat. at 1278. It limits the applicability of all but one of the changes to persons whose convictions were entered on or after AEDPA's enactment date. *See id.* This provision is also less fully retroactive than the terrorism provisions because it does not reach all pre-AEDPA conduct.

Section 441 contains a bar on collateral challenges to deportation orders for persons subsequently charged in criminal proceedings with illegal reentry. *See id.* § 441(b), 110 Stat. at 1279. Section 441(b) provides that the bar applies to criminal prosecutions subsequent to AEDPA's enactment, regardless of the date of the deportation order or when the acts on which it was based occurred. This provision is not as fully retroactive as the terrorism provisions because it does not reach pre-AEDPA illegal re-entries.

Congress specified in each of the above provisions whether and how much it would apply to pre-AEDPA conduct. This attention to retroactivity is not surprising. As the Court noted in *Lindh,* AEDPA was enacted shortly after the ruling in *Landgraf* affirming the importance of specificity in making legislation retroactive. *See* 521 U.S. at 328, 117 S.Ct. 2059 (Congress could have read *Landgraf* as "counseling the wisdom of being explicit"). In this con-text, section 440(d)'s silence as to its retroactive applicability and Congress's treatment of the elimination of discretionary relief in other provisions of the same title as the type of matter that required specific language make it reasonable to conclude that Congress did not design section 440(d) to be applied in a way that would change the consequences of past conduct. The narrower conclusion of inapplicability to pending proceedings drawn by the court of appeals for the Second Circuit, *see Henderson,* 157 F.3d at 130–31, and by other courts of appeals following a similar approach, *see, e.g., Mayers,* 175 F.3d at 1302–03; *Sandoval,* 166 F.3d at 225; *Goncalves,* 144 F.3d at 128–31, was not required by these courts' reasoning, which also supports the broader conclusion now being drawn. *See Pottinger,* 51 F.Supp.2d at 359.

### 2. Ambiguity Does Not Support Retroactivity

Even if section 440(d) were deemed ambiguous as to its temporal scope, the presumption against retroactivity would support granting Mr. Maria a humanitarian hearing. In *Landgraf,* the Supreme Court set forth the analytic framework for evaluating the retroactive reach of legislation. It began with the basic principle that "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." 511 U.S. at 265, 114 S.Ct. 1483 (citing *Kaiser Aluminum Chem. Corp. v. Bonjorno,* 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring)). Under *Landgraf,* a statute will not be read to apply retroactively unless Congress "affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Id.* at 272–73, 114 S.Ct. 1483. Thus, new legislation is presumed not to apply to past conduct absent a clear contrary directive from Congress.

The *Landgraf* presumption looks to the date on which the relevant conduct took

place. "Even when the conduct in question is morally reprehensible or illegal, a degree of unfairness is inherent whenever the law imposes additional burdens based on *conduct* that occurred in the past." *Id.* at 283 n. 35, 114 S.Ct. 1483 (emphasis added).

In *Landgraf,* for example, the question was whether new civil rights remedies could be imposed based on past illegal sexual harassment. The Court ruled that, even though the sexual harassment was illegal at the time it occurred, a change in the legal consequences attaching to it—in the form of a new type of damage remedy—should not be applied to conduct predating the enactment of the new damage remedy. "[T]he *extent* of a party's liability, in the civil context as well as the criminal," the Court explained, "is an important legal consequence that cannot be ignored." *Id.* at 283–84, 114 S.Ct. 1483 (emphasis in original).

The degree to which an individual might have considered the immigration consequences of a crime at the time he or she committed it is not decisive. What is relevant is the imposition of a new burden or liability on a past act. *But see LaGuerre,* 164 F.3d at 1041 (suggesting that retroactivity analysis depends on such assumed reliance). Whether or not the operative conduct might have been different, the immigrant has a presumptive right to the imposition of only those consequences which could have attached at the time he committed his act.

A new law can have a genuinely retroactive effect without changing the theoretical extent of a party's liability. *See Hughes Aircraft co. v. U.S. ex rel. Schumer,* 520 U.S. 939, 947–48, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). In *Hughes Aircraft,* for example, the question was whether a 1986 amendment to the False Claims Act eliminating a defense to suits brought under the Act's qui tam provisions applied to a case arising out of false claims submitted prior to the amendment's adoption. Elimination of the defense in question technical-

ly did not increase the defendant's liability exposure because it had never been available in suits brought by government litigators. It did, however, enlarge the ranks of potential private qui tam plaintiffs, who, the Court emphasized, were apt to be motivated by mercenary considerations and more likely than government litigators to pursue suits based on technicalities in which no actual harm to the public fisc had occurred. *Id.* at 949–950, 117 S.Ct. 1871. The Court stated: "While we acknowledge that the monetary liability faced by [this] defendant is the same whether the action is brought by the Government or a qui tam relator, the 1986 amendment eliminates a defense to a qui tam suit—prior disclosure to the Government—and therefore changes the substance of the existing cause of action ... by 'attaching a new disability, in respect to transactions or considerations already past.' " *Id.* at 948, 117 S.Ct. 1871 (quoting *Landgraf,* 511 U.S. at 269, 114 S.Ct. 1483). Given the practical impact of the new law, the Court held that it should not be applied to pre-enactment conduct absent a clear statement to the contrary from Congress. *Id.* at 952, 117 S.Ct. 1871.

The application of AEDPA section 440(d) to the petitioner would have a retroactive effect similar to that in *Hughes Aircraft.* The elimination of the right to apply for section 212(c) relief, like the elimination of the prior government disclosure defense in *Hughes Aircraft,* does not change the magnitude of the petitioner's potential liability. It does, however, increase the likelihood that this liability, i.e., deportation, will be imposed. In light of the fact that relief was previously granted in some half of all section 212(c) hearings, see *Mojica,* 970 F.Supp. at 178, retroactive application of section 440(d) would effect a major change in the consequences of past conduct.

The Ex Post Facto Clause prohibits increased penalties based on past offenses, regardless of the date of conviction. The crucial ex post facto date is the one on

which an offense is committed. Numerous cases interpreting the Clause have ruled that the change of a possible consequence of past activity into a necessary one is retroactive. *See Mojica*, 970 F.Supp. at 174–75. Converting a maximum sentence into a mandatory one, for example, has a retroactive effect. *See id.* at 175 (citing *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937)). Similarly, the elimination of eligibility for parole, thereby increasing the practical consequences of a prison term, has a retroactive impact. *See id.* at 174–75 (citing *Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974)).

In *Landgraf* and *Hughes Aircraft*, the Supreme Court turned to ex post facto jurisprudence to decide which consequences are genuinely retroactive and thus subject to *Landgraf*'s clear statement rule. Although the Court noted that Ex Post Facto Clause prohibitions are limited to punitive legislation, it relied on this case law to answer the preliminary question of what it means for a law to be retroactive. *See, e.g., Hughes Aircraft*, 520 U.S. at 948, 117 S.Ct. 1871 (citing *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) and *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925)); *Landgraf*, 511 U.S. at 269 n. 23, 114 S.Ct. 1483 (citing *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987)).

In the instant case, retroactive application of AEDPA's bars to relief from deportation would change a theoretical consequence of pre-enactment conduct (possible deportation) into a necessary consequence (deportation). In functional terms, this is the same as eliminating a defense from a suit. It is also functionally equivalent to changing a maximum sentence—the possibility of deportation—into a mandatory one. Under *Hughes Aircraft*, *Landgraf* and the retroactivity analysis of the ex post facto cases, this is a genuinely retroactive effect that cannot be imposed by the courts or administrative agencies absent a

clear statement from Congress. Because Congress did not make such a statement, AEDPA section 440(d) may not be applied retroactively.

### 3. Rule of Lenity

Apart from the application of *Landgraf* principles, the rule of lenity requires the construction of "any lingering ambiguities in deportation statutes in favor of the alien." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *see also Pottinger*, 51 F.Supp.2d at 363; *Mojica*, 970 F.Supp. at 180. The rule of lenity complements the *Landgraf* rule by assuring that Congress has given due consideration to the extreme consequence of deportation even where retroactive application of a law is not the issue in question. Where retroactivity is at issue, the rule of lenity, like the *Landgraf* rule, guarantees that a new immigration law will be applied to past conduct only when Congress clearly wished that result. *See Mojica*, 970 F.Supp. at 180 (quoting *Kessler v. Strecker*, 307 U.S. 22, 30, 59 S.Ct. 694, 83 L.Ed. 1082 (1939)). In this case, even if section 440(d) were ambiguous as to its temporal scope, the rule of lenity would mandate that the statute be read so as not to reach conduct pre-dating its enactment.

### 4. Avoidance of Constitutional Issues Supports Non-retroactivity

The application of section 440(d) to Mr. Maria arguably would violate constitutional protections against retroactive lawmaking. Thus, the desirability of judicial avoidance of constitutional conflicts with Congress and the President suggests that the statute should be interpreted where possible to preclude retroactivity to petitioner. *See, e.g., Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 1228, 143 L.Ed.2d 311 *passim* (1999) ("Any doubt on the issue of statutory construction is ... to be resolved in favor of avoiding those [constitutional] questions.").

### a. Due Process Clause

The due process issues, already dealt with in Section III.C.2.a, *supra*, are also implicated in attempts to retroactively apply section 440(d) of AEDPA. *See Mojica*, 970 F.Supp. at 169–71. Applied prospectively, the statute provides "notice of the severe and certain consequences that will flow from commission of any of the crimes enumerated in section 440(d)." *Id.* at 170. Applied retroactively, "it works only to upset and frustrate expectations." *Id.* The harshness of retroactive application to deny a section 212(c) hearing is all the more apparent in a case like this one in which a crime that did not even subject the person to possible deportation at the time he committed it—or even at the time of conviction—becomes grounds for mandatory deportation without a humanitarian hearing.

"Congress offered no purpose for retroactivity" and the Attorney General "merely defends retroactivity as permissible." *Mojica*, 970 F.Supp. at 169. In view of the severe consequences of deportation, this failure to provide a purpose is arguably sufficient in itself to establish that Congress believed it lacked the requisite independent rationale to justify ordering deportation for past acts without a humanitarian hearing. *See Pension Benefit Guar. Corp.*, 467 U.S. at 730, 104 S.Ct. 2709. Absent such a rationale, application of section 440(d) to the petitioner would violate due process prohibitions on retroactivity—a result which Congress must be presumed not to have intended.

### b. Ex Post Facto Clause

The Ex Post Facto Clause, already discussed in Part II.C.b.2, *supra*, is not an independent basis for striking down a deportation law. Nevertheless, it is a facet of the broader constitutional antiretroactivity principle that any interpretation of section 440(d) should avoid offending.

### 5. International Law

An act of Congress should be construed in accordance with international law where it is possible to do so without distorting the statute. *Filartiga v. Pena-Irala*, 630 F.2d 876, 887 n. 20 (2d Cir.1980) (quoting *The Charming Betsy*, 6 U.S. (2 Cranch) 64, 67, 2 L.Ed. 208 (1804)). *See also* Restatement (Third) of Foreign Relations Law § 114 (1987) ("Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States."). Congress can be assumed, in the absence of a statement to the contrary, to be legislating in conformity with international law and to be cognizant of this country's global leadership position and the need for it to set an example with respect to human rights obligations. Where possible, statutes should be construed with this principle in mind. *See Mojica*, 970 F.Supp. at 146–52 (analyzing human rights obligations of the United States). The retroactive deprivation of Mr. Maria's statutory right to humanitarian relief from deportation would arguably be contrary to both the International Covenant on Civil and Political Rights ("ICCPR") and customary international human rights law.

### a. The International Covenant of Civil and Political Rights

The ICCPR became the law of the United States on September 8, 1992. *See* ICCPR, Dec. 19, 1966, 999 U.N.T.S. 171 (*entered into force* Mar. 23, 1976, *entered into force for the United States* Sept. 8, 1992). It applies to all people within the territory of the United States. *See* ICCPR, art. 2. Retroactive application of AEDPA section 440(d) to Mr. Maria would conflict with provisions of the ICCPR which protect his rights to be free of arbitrary interference with his family life and to present reasons why he should not be deported. Although the ICCPR is not self-executing, *see* 138 Cong.Rec. S4784 (daily ed. Apr. 2, 1992), it is an interna-

tional obligation of the United States and constitutes a law of the land. *See generally,* Louis Henkin, *The Constitution and United States Sovereignty: A Century of Chinese Exclusion and its Progeny,* 100 Harv.L.Rev. 853, 867 n. 65 (1987).

Article 23(1) of the ICCPR provides that "[t]he family is the natural and fundamental group unit of society and is entitled to protection by society and the State." Implicit in this right is the right of family members to live together. *See* Human Rights Committee, General Comment 19, U.N.Doc. CCPR/C/21/Rev. 1/Add.2 (Sept. 19, 1990).

To protect the fundamental right of families to live together, the ICCPR provides that "[n]o one shall be subjected to arbitrary or unlawful interference with his ... family...." ICCPR, art. 17. Applying this requirement in the context of deportation laws, the United Nations Human Rights Committee has explicitly recognized that deportation from a country in which close family members reside can constitute an interference with family life. Communication No. R.9135, *Aumeeruda–Cziffra v. Mauritius,* U.N. GAOR, Hum. Rts.Comm., 36th Sess., Supp. No. 40, Annex 13, at 134, U.N.Doc A/36/40 (1981). The Human Rights Committee's General Comments and decisions in individual cases are recognized as a major source for interpretation of the ICCPR. *See* Gerald L. Neuman, *The Global Dimension of RFRA,* 14 Const. Comment 33, 44 n. 63 (1997) and sources cited therein.

By specifying that interference with family shall be "unlawful" and shall not be "arbitrary," the ICCPR prevents a nation from separating families in a manner that, while in accordance with its domestic law, is nonetheless unreasonable and in conflict with the underlying provisions of the ICCPR. As explained by the authoritative United Nation Human Rights Committee, "the introduction of the concept of arbitrariness is intended to guarantee that even interference provided for by law should be in accordance with the provi-

sions, aims and objectives of the Covenant and should be, in any event, reasonable in the particular circumstances." Human Rights Committee, General Comment 16 (32d sess.1988), IHRR Vol. 1 No. 2 (1994).

Article 7 of the ICCPR provides that "[n]o one shall be subjected to ... cruel, inhuman or degrading treatment...." Expulsion from a country that separates a person from others with whom he has close links, even if not members of his immediate family, may be considered a violation of Article 3 of the European Convention on the Protection of Human Rights and Fundamental Freedoms, which is almost identical to Article 7 of the ICCPR. *See* P. van Dijk & G.J.H. van Hoof, *Theory and Practice of the European Convention on Human Rights* 235–37 (1990) (quoted in *Xuncax v. Gramajo,* 886 F.Supp. 162, 188 (D.Mass.1995)).

Article 13 of the ICCPR requires that an alien lawfully residing in a territory "be allowed to submit the reasons against his expulsion" unless compelling interests of national security require otherwise. ICCPR, art. 13. Here, the application of section 440(d) of AEDPA prevented Mr. Maria from presenting to the immigration judge the reasons why he should not be deported. These reasons included the fact that he was rehabilitated and that deportation would permanently separate him from his entire family, to their great harm as well as his. Since the government does not contend that compelling national security reasons prevent Mr. Maria from presenting the reasons why he should not be deported, the application of section 440(d) retroactively to him is contrary to Article 13 of the ICCPR.

Under the law in effect prior to AEDPA, section 212(c) provided long-term permanent residents with the type of relief contemplated by the ICCPR. Although no one was guaranteed a right to remain in this country, a long-term lawful permanent resident could appear before an immigration judge and prove the adverse impact

deportation would have on his or her family. As established in *Matter of Marin*, 16 I & N Dec. 581 (BIA Aug. 4, 1978), the immigration judge was required to consider such factors as proven rehabilitation and the permanent resident's family ties. The consequences of deportation for remaining family members had to be considered. *See In re Catalina Arreguin de Rodriguez*, Int.Dec. 3247 (BIA May 11, 1995). Retroactive application of AEDPA threatens precisely the type of arbitrary family break-up that the ICCPR guards against.

### b. Customary International Law

 Customary international law, which is comprised of the customs and usages among nations of the world, is part of the law of the United States. *See The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900). The United States applies the international customary law of human rights which is part of the greater body of law. See Restatement (Third) of the Foreign Relations Law of the United States § 701 cmt. e (1987). Customary international law is not static but fluid and evolving. *See Filartiga*, 630 F.2d at 881 (citing *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 1 L.Ed. 568 (1796)).

A nation's sovereign power to exclude and expel aliens is limited by international human rights law's recognition of the rights of individuals. During the nineteenth century, the rights of individuals were not subjects of international law. *See* Louis Henkin, "Evolving Concepts of International Human Rights Law and the Current Consensus," 170 F.R.D. 275, 276 (1997). International law was concerned with the relations between sovereign nations and not with the treatment by those nations of individuals within their borders. *See, e.g., The Antelope*, 23 U.S. (10 Wheat.) 66, 90, 6 L.Ed. 268 (1825) (although slavery was contrary to the law of nature, it was not yet outlawed by the law of nations which was established for regulating the "intercourse of nations with each other");

*The Diana*, 1 Dods. 95, 165 Eng.Rep. 1245 (Adm.1813) ("Our own country ... has decreed the abolition of the slave trade, as far as British subjects are concerned; but it claims no right of enforcing its prohibition against the subjects of those states which have not adopted the same opinion with respect to the injustice and immorality of the trade.").

Beginning with the acknowledgment by the League of Nations that slavery and the slave trade violated international law, the international community has increasingly recognized that the sovereign powers of nations must be balanced against what are now acknowledged as individual human rights. *See* Slavery Convention, Sept. 25, 1926, 60 U.N.T.S. 253 (*entered into force* Mar. 9, 1927). Evolving human rights support the claim that every society has an obligation to respect every human being within its control. *See* Restatement (Third) of the Foreign Relations Law of the United States § 701; Henkin, *supra*, 170 F.R.D. at 276. Every nation now must take the rights of foreigners into account when determining whether they should be excluded or expelled from its territory.

The rights to be free from arbitrary interference with family life and from arbitrary expulsion are human rights that are part of customary international law that must be followed by the United States. Evidence of customary international law is found in (1) the general usage and practice among nations, (2) the works of jurists and writers, and (3) judicial decisions recognizing and enforcing that law. *See Filartiga*, 630 F.2d at 880; *see also* Statute of the International Court of Justice, art. 38 (court is to apply international conventions establishing rules recognized by the contesting states, international custom, the general principles of law recognized by civilized nations, and judicial decisions and teachings of qualified publicists). As recognized in *Mojica*, many international conventions contain provisions that protect

resident aliens from arbitrary expulsion. *See* 970 F.Supp. at 147–48.

The right to live and associate with family members is not only recognized in the ICCPR, but is recognized in numerous other treaties and international declarations. *See, e.g.,* Universal Declaration of Human Rights, art. 16(3), G.A.Res. 217A (III), U.N. GAOR, 3d. Sess., Supp. No. 71, U.N.Doc. A/810 (adopted Dec. 10, 1948) ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the state."); *id.* at art. 12 ("No one shall be subjected to arbitrary interference with his ... family"); International Covenant on Civil and Political Rights, art. 10(1), G.A.Res. 2200, U.N. GAOR, 21st Sess., Supp. No. 16, at 49, U.N.Doc. A/6316 (1966), 999 U.N.T.S. 171 (adopted by United States June 8, 1992) ("The widest possible protection and assistance should be accorded to the family, which is the natural and fundamental group unit of society...."); American Convention on Human Rights, art. 17(1), OEA/Ser.L.V/II.82 doc. 6 rev. 1 at 25, 1144 U.N.T.S. 123 (*entered into force* July 18, 1978), *reprinted in* Basic Documents Pertaining to Human Rights in the Inter–American System ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State."); *id.* at art. 11(2), 1144 U.N.T.S. 123 ("No one may be the object of arbitrary or abusive interference with his ... family...."); European Convention for Protection of Human Rights and Fundamental Freedoms, art. 8, 213 U.N.T.S. 222 (*entered into force* Sept. 3, 1953), as amended by Protocols Nos. 3, 5 and 8 (*entered into force* Sept. 21 1970, Dec. 20, 1971, and Jan. 1, 1990) ("Everyone has the right to respect for his ... family life...."); African [Banjul] Charter on Human and Peoples' Rights, art. 18(1), OAU Doc. CAB/LEG/67/3 rev. 5, 21 I.L.M. 58 (1982) (*entered into force* Oct. 21, 1986) ("The family shall be the natural unit and basis of society.").

The United States Supreme Court recognizes that the right to associate with family members, even family members beyond the nuclear family, is protected by the Due Process Clause of the Fourteenth Amendment. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (finding that natural parents have fundamental liberty interest in care, custody and management of their child); *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (holding that grandmother and her two grandsons constituted a "family" entitled to constitutional protection and invalidating zoning restriction that prohibited them from living together).

In sum, the rights to be free from arbitrary interference with family life and arbitrary expulsion are part of customary international law. The retroactive application of section 440(d) of AEDPA to Mr. Maria would not only be contrary to this nation's obligations under the ICCPR, which it ratified, it would be a violation of customary international human rights law, to which the United States is bound as a member of the community of nations— violations that Congress, it can be assumed, would want to avoid; this is a factor that must be given weight in statutory construction. The fact that the ICCPR creates no private right of action does not eliminate the obligations of the United States and all of its branches of government.

**E. IIRIRA's Restrictions on Family Hardship Relief**

Prior to the enactment of IIRIRA, section 212(h) relief was available to all aliens. 8 U.S.C. 1182(h) (1994). IIRIRA Section 348(a) barred 212(h) relief for lawful permanent residents convicted of an "aggravated felony." IIRIRA § 348(a), 110 Stat. at 3009–639. Petitioner argues that imposing such a disability only on lawful permanent residents and not on other aliens violates the Equal Protection Clause. Under section 348, petitioner con-

tends, lawful permanent residents like him are denied relief available to all other non-citizens. Had Mr. Maria not been a lawful permanent resident (had he, for example, overstayed a visitor's visa), he would, he contends, have been eligible to apply for 212(h) relief. In a case decided in January, 1998, the BIA permitted a person who had resided in the United States unlawfully to seek 212(h) relief even though he had been convicted of an "aggravated felony." *See In re Sidney Michel,* 1998 WL 40407(BIA).

The resolution of this equal protection issue is not critical in the instant case. Even though lawful permanent residents are technically entitled to a 212(h) waiver, as a practical matter they apply for 212(c) relief where available because it is easier to obtain. *See* Richard L. Prinz, *Criminal Aliens Under the IIRIRA,* SD61 ALI–ABA 319, 337 (1999) (noting that cancellation of removal, which replaced 212(c) relief is in most cases an easier road to relief than section 212(h) relief for permanent residents or those lawfully residing here over seven years). In Mr. Maria's case, the sole basis for 212(h) relief, family hardship, will be considered in the context of the 212(c) hearing to which he is entitled.

Family hardship is one of a number of equitable considerations, including Mr. Maria's employment history and alleged rehabilitation, supporting his application for 212(c) relief. It is not necessary to decide whether he would have been eligible for a separate 212(h) hearing had he lacked grounds for a favorable decision in a 212(c) hearing. For the same reason, it is not necessary to decide whether—to the extent Mr. Maria is making such an argument—the elimination of his right to a 212(h) hearing violates the Due Process Clause.

There may be cases in which extreme family hardship entitles an alien to relief under section 212(h) but not under section 212(c). In such a case, a lawful permanent resident in Mr. Maria's position might well be entitled to a ruling that precluding him or her from applying for family hardship relief is unconstitutional on due process or equal protection grounds.

## V. RATIONALE OF STATUTE

When construing a complex immigration statute involving the welfare of millions of United States residents, it is necessary to take a holistic approach. *See, e.g., Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 passim (1999) (use of language and grammar, comparison with other portions of the statute, legislative history, traditional treatment of related crimes and principles of criminal law, and avoidance of constitutional doubt). The court must: (1) study the language and legislative history of the applicable provisions, in (2) the context of the complex statutory scheme, with (3) a long history implicating basic and changing attitudes of a country largely populated by immigrants and by their progeny, (4) having impacts on citizen and legal resident alien family members and (5) affecting the nation's productive capacity as enhanced by working aliens, as well as (6) the sequelae in other nations to whose shores deportees are sent, and to consider (7) constitutional and international law restraints, and (8) the need to avoid misconstruction which unnecessarily deprives persons of the fundamental human right not to be unreasonably uprooted from their country of long time residence.

Discernible in title 8 of the United States Code, dealing with immigration and naturalization, is a consistent, integrated policy and plan of Congress illuminating the provisions at issue. It is described below.

First, an "aggravated felon" *prima facie* lacks, the theory goes, the kind of character we expect of our alien residents and should be deported. Criminal acts reflect the nature of that character. As the seriousness of crimes defining character were reduced, concomitantly there was a raising of the minimum standards of lawfulness

and character for resident aliens. More and more persons would fail the test of character based upon conclusions drawn simply from their past criminal acts. While imperfect as a reflection of character, convictions of crimes are at least precise, clear and readily proven and are, therefore, an acceptable working surrogate for character.

Second, until the enactment of AEDPA 440(d) and the current removal provisions barring relief for lawful permanent residents convicted of an "aggravated felony," a lawful permanent resident of long standing who had committed a crime was permitted to rebut this presumption of inadequate character through a humanitarian 212(c) hearing. At the hearing, the alien could show rehabilitation or that, in view of other evidence, the criminal act did not truly reflect basic character defects, thus demonstrating that allowing continued residence in the United States was in the country's interest. In this connection, healthy family ties could both reduce the likelihood of future criminal conduct and reduce the harm and pain to members of the family who would continue to reside here. This humanitarian relief was available to any lawful permanent resident with a seven-year United States domicile who had not served a five-year prison term in connection with an "aggravated felony," which was, as noted, substantially more narrowly defined before 1996.

Such a regime ensured that the nation was not deprived of aliens worthy of remaining here and of continuing as productive and law abiding residents. That congressional scheme can be fully vindicated without retroactively eliminating the right to a humanitarian hearing.

## VI. CONCLUSION

Mr. Maria's equal protection claims are dismissed as unnecessary for the disposition of this case. The petition for a writ of habeas corpus is granted. Respondent shall adjudicate Mr. Maria's case so as to provide petitioner with the right to a hu-

manitarian hearing essentially available at the time he committed the attempted robbery for which he has been convicted. The availability of a hearing is not affected by the current "aggregate limitation" on cancellation of removal relief. *See* 8 U.S.C. § 1229b(e). The petition is denied insofar as it seeks to have petitioner denominated nondeportable.

SO ORDERED.